In the District Court of the United States
For the District of South Carolina
CHARLESTON DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC

2006 JAN -3 P 3: 23

| | |
|---|---|
| Bituminous Casualty Corporation, | C.A. NO. 2:01-4267-DCN-GCK |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE |
| R.C. Altman Builders, Inc., Robert N. Grove, Waverly Building Company, LLC, Auto-Owners Insurance Co., Carl Nelson d/b/a Nelson Masonry and Bobby Vincent d/b/a Vincent's Plumbing, | |
| Defendants. | |

## I. INTRODUCTION

This case has been referred from the Honorable David C. Norton, United States District Judge for the District of South Carolina, to the undersigned United States Magistrate Judge for a Report and Recommendation with respect to motions for summary judgment filed by the defendant Auto Owners Insurance Company, the plaintiff Bituminous Casualty Corporation, and the defendants R.C. Altman Builders, Inc. and Robert N. Grove.

## II. FACTS

In 1996, Mr. and Mrs. Robert N. Grove entered into a contract with R.C. Altman Builders, Inc. ("R.C. Altman") to construct a residence (the "Home") in DeBordieu Colony in

Georgetown County for a total price of $359,202.00.[1] In 1997, a certificate of occupancy was issued for the Home.

In January 2000, Robert N. Grove ("Grove") filed suit against "Ronald C. Altman individually, and d/b/a Altman Builders, n/k/a Waverly Building Co, LLC" ("R.C. Altman"),[2] in the Court of Common Pleas for Georgetown County. In January 2001, Grove filed an amended complaint,[3] followed by a second amended complaint (the operative Complaint in this proceeding)[4] to include additional defendants, captioning the complaint as "Ronald C. Altman individually and, d/b/a R.C. Altman Builders, now d/b/a Waverly Building Co. LLC, Nelson Masonry, Jeff Blackburn, Summers Roofing, Tri-County Insulation, John Summers, and Vincent's Plumbing." Grove sought to recover damages arising from the construction of the Home under theories of breach of implied warranties and negligence with respect to all defendants, and breach of contract and unfair trade practices with respect to "Ronald C. Altman individually and, d/b/a R.C. Altman Builders, now d/b/a Waverly Building Co. LLC." The

---

[1] These facts are taken from the Plaintiff's "Summary of the Case" set forth in its Memorandum in support of its motion for summary judgment. [100-2] The defendants R.C. Altman and Grove incorporated the Summary of the Case in their Memorandum in Opposition to Plaintiff's motion for summary judgment. See Memorandum in Support of Motion for Summary Judgment filed by R.C. Altman and Grove at p. 2.

[2] R.C. Altman is now known as Waverly Building Company, LLC. See Plaintiff's Memorandum in Support of Motion for Summary Judgment [100-1] at p. 2. The defendant Auto Owners refers to R.C. Altman as "Waverly", but R.C. Altman refers to itself as R.C. Altman and this court shall do the same.

[3] The additional parties who were served and appeared were Auto Owners Insurance Company ("Auto-Owners"), Robert N. Grove, Waverly Building Company, LLC, and Colony Specialty Insurance Company. The last of these defendants was dismissed from the case by a stipulation of dismissal filed on March 7, 2003 after discovery revealed that its policy was inapplicable because it had expired before the residence was completed.

[4] The Second Amended Complaint, attached to the Memorandum filed by R.C. Altman and Grove [109-1] as Exhibit D, hereafter will be referred to as the "Complaint" in this Report and Recommendation.

Complaint added parties who were not named insureds under insurance policies issued by the Plaintiff Bituminous Casualty Corporation (the "Plaintiff") in the instant action, but who appeared actually or likely to claim an interest in the litigation.

After having been served with the state court Complaint, R.C. Altman notified Auto-Owners Insurance Company ("Auto-Owners") of the claims via loss notices. According to Auto Owners, "[t]he losses were all purported to have occurred during the period of time wherein Auto Owners provided insurance coverage to [R.C. Altman]."[5] Auto-Owners provided a defense to the Complaint on behalf of R.C. Altman under a reservation of rights.[6]

In November 2001, Plaintiff filed the instant action against R.C. Altman. [1-1] In August 2002, Plaintiff filed an Amended Complaint [22-1] pursuant to 28 U.S.C. § 2201 against R.C. Altman, Grove, Waverly Building Co., LLC, Auto-Owners, and several other parties, seeking a determination of its obligations under certain Commercial General Liability ("CGL") insurance policies which Plaintiff had issued to R.C. Altman.[7] Auto-Owners states by brief that it "presum[es] it was sued by [Plaintiff] in the declaratory judgment action since it insured [R.C. Altman] and was being joined as a necessary party."[8]



---

[5] See Auto-Owners' Memorandum in Support of its Motion for Summary Judgment [95-2] at p. 2.

[6] See Auto-Owners' Memorandum in Support of its Motion for Summary Judgment [95-2] at p. 2.

[7] CGL insurance normally provides coverage for the general liabilities of businesses, including "damages that the insured becomes legally obligated to pay to a third party because of bodily injury or property damage." Black's Law Dictionary 646 (abridged 7th ed.2000); see also Robert H. Jerry, II, Understanding Insurance Law § 65[a] (2d ed.1996).

[8] See Auto-Owner's Memorandum in Support of its Motion for Summary Judgment [95-2] at p. 2.

Thereafter, on October 8, 2002, Auto-Owners filed an Answer and a Cross-Claim against Waverly (R.C. Altman), seeking declaratory relief, and subsequently filed an Amended Answer and Cross Claim on October 17, 2002. R.C. Altman denied the allegations.[9]

In January 2003, Grove negotiated a settlement with R.C. Altman in which Grove accepted a Confession of Judgment in the amount of $300,000.00 and an assignment of R.C. Altman's rights under the insurance policies issued to it by Plaintiff.[10] In exchange, Grove granted a full and complete release to Faye and Ronald Altman, personally.[11] Auto-Owners contends that R.C. Altman was dismissed from the State suit, but the remaining defendants, including Waverly, were not released.[12] The State lawsuit was stayed pursuant to Rule 40(j) of the South Carolina Rules of Civil Procedure, but later restored to the docket by Judge Thomas.[13]

On February 19, 2003, Plaintiff filed a motion to stay the trial of the instant action in order to await the South Carolina Supreme Court's decision in L-J, Inc., and Eagle Creek Constr. Co. v. Bituminous Fire & Marine Ins., 567 S.E.2d 489 (Ct. App. 2002), which presented a question similar to the one at bar regarding CGL insurance coverage. In a Consent Scheduling Order issued on March 20, 2003, the District Court found that the matters of law being decided



---

[9] See Auto-Owner's Memorandum [95-2] at p. 3.

[10] See Plaintiff's Exhibits 4 and 5, attached to Plaintiff's Memorandum. [100-1]

[11] See Plaintiff's Exhibit 6, attached to Plaintiff's Memorandum. [100-1]

[12] See Auto-Owner's Memorandum [95-2] at p. 3.

[13] Auto-Owners contends that the state suit was stayed on April 25, 2002 pursuant to Rule 40(j) of the South Carolina Rules of Civil Procedure and a motion was filed on February 4, 2003 to restore the case to the trial roster. However, Auto-Owners argues that a Consent Order was never provided to the court, so "[a]s a result in the eyes of the Georgetown Clerk of Court, the underlying matter is concluded." Id. However, Grove and R.C. Altman contend that a motion to restore the case was granted by Judge Thomas. See Memorandum in Opposition to Auto-Owners' Motion for Summary Judgment, filed by Grove and R.C. Altman [101-1] at pp 1-2 and Exhibit A thereto.

in the L-J litigation were central to those in the present case, and thus necessary for a determination in the case. Consequently, the District Court determined that the interests of justice and judicial economy would be served by allowing the South Carolina Supreme Court to decide those issues prior to the resolution of the instant case, and entered an oral Order staying final determination of this action pending the state Supreme Court's decision. [71-1]

On August 9, 2004, the South Carolina Supreme Court reversed the opinion of the Court of Appeals in L-J, but the judgment did not become final pending resolution of a motion for rehearing. By an order filed September 26, 2005, the South Carolina Supreme Court withdrew its August opinion and issued a new opinion reversing the decision by the Court of Appeals. *See* L-J, Inc., and Eagle Creek Constr. Co. v. Bituminous Fire & Marine Ins., 366 S.C. 117, 621 S.E.2d 33 (2005). On rehearing, the South Carolina Supreme Court held that premature damage caused by a contractor's faulty workmanship did not constitute an "occurrence" within the meaning of the contractor's CGL policy. L-J, 621 S.E.2d at 35.

As a result of the decision in L-J, the following motions were filed and have been referred to the undersigned United States Magistrate Judge:

- The defendant Auto-Owners' Motion for Summary Judgment filed on October 7, 2005;[14] [95-1]

- The Plaintiff's Motion for Summary Judgment filed on November 14, 2005; [100-1] and

---

[14] Although Auto-Owners is a defendant in this action, the Plaintiff has not asserted any affirmative claims against Auto-Owners. However, Auto-Owners has asserted a cross-claim against Waverly, seeking declaratory relief. *See* Auto-Owners' Memorandum [95-1] at p. 1., n.1.

- The Motion for Summary Judgment filed by defendants R.C. Altman and Grove on December 12, 2005. [109-1]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, a "mere scintilla" of evidence will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly . . . find a verdict for the party" resisting summary judgment. Id. at 251. Conclusory allegations or denials, without more, will not preclude the granting of a summary judgment motion. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985).[15]

### IV. DISCUSSION

#### A. Auto-Owner's Motion for Summary Judgment

First, the court will address the merits of Auto-Owner's Motion for Summary Judgment, filed on October 7, 2005. [95-1] Initially, Grove filed suit in Georgetown County in January

---

[15] Disher v. Synthes, (U.S.A.), 271 F.Supp.2d 764, 768-69 (D.S.C. 2005).

2000 against Waverly, as the caption named the defendants thereto as "Ronald C. Altman individually, and d/b/a Altman Builders, n/k/a Waverly Building Co, LLC" ("R.C. Altman").[16] As mentioned above, in January 2001, Grove's underlying state court Complaint named Auto-Owner's insured as "Ronald C. Altman individually and, d/b/a R.C. Altman Builders, now d/b/a Waverly Building Co. LLC[.]"

The gravamen of Auto-Owner's argument in support of its Motion for Summary Judgement is that the claims against Waverly are "pass through" allegations because it is alleged that R.C. Altman is "n/k/a" Waverly.[17] Auto-Owners argues that Waverly's principal, Ron Altman, testified that Waverly did not work at the Grove Home, and received no money from Grove.[18] Auto-Owners filed for summary judgment on the grounds that (1) the allegations of the complaint do not trigger the duty of defense; (2) if the duty to defend is triggered, there is no "occurrence" present, and therefore, no duty to indemnify; and (3) if an "occurrence" is present, then the policy exclusions exclude coverage on this matter.[19]

Taking these issues in the order in which they were raised, Auto-Owners first argues that it does not have a duty to defend, because "there is no allegation that Waverly, or it's [sic] agents, performed any work on the Grove [Home] after August 13, 1997."[20] Auto-Owners argues

---

[16] R.C. Altman is now known as Waverly Building Company, LLC. *See* Plaintiff's Memorandum in Support of Motion for Summary Judgment [100-1] at p. 2. The defendant Auto Owners refers to R.C. Altman as "Waverly", but R.C. Altman refers to itself as R.C. Altman and this court shall do the same.

[17] *See* Auto-Owners' Memorandum [95-2] at p. 5 (quotations in original pleading).

[18] *See* Auto-Owners' Memorandum [95-2] at p. 6 (citations omitted)

[19] *See* Auto-Owners' Memorandum [95-2] at p. 6. Given the court's reasoning in this case, and its ultimate recommendation, it will not address the third question posed by Auto-Owners.

[20] *See* Auto-Owners' Memorandum [95-2] at p. 9 (footnote omitted).

that because the state lawsuit alleges that the Home was built more than a year before Auto-Owners began insuring Waverly, it is under no duty to defend in this action.[21] Auto-Owners also argues that "[s]uccessor liability cannot extend to a policy of insurance."[22] Furthermore, the state lawsuit does not allege that any acts or omissions of Waverly have caused damage to Grove; instead, it is alleged that "Waverly is a successor in interest to R.C. Altman"[23] which "cannot affect a contractual relationship with Auto-Owners." Thus, Auto-Owners argues that it should be relieved of its duty to defend and any obligation to indemnify because Auto-Owners did not insure R.C. Altman. Finally, because the action against Waverly has been dismissed but the confession of judgment is not as to Waverly, Waverly is judgment-proof and there is nothing for Auto Owners to defend or indemnify.[24]

Reduced to its simplest terms, Auto-Owners argues that because Waverly did not exist before the Home was completed, Waverly cannot be liable.[25] Unfortunately for Waverly, the law of South Carolina does not support its argument. South Carolina law holds that "[u]pon the consolidation or merger of two corporations, the transferee or successor corporation remains fully liable for the liabilities of the transferor corporation." R.C. McEntire & Co. v. Eastern Foods, Inc., 702 F.2d 471, 474 (4th Cir. 1983) (applying South Carolina law).



---

[21]  Id.

[22]  See Auto-Owners' Memorandum [95-2] at p. 10 (footnote omitted).

[23]  See Auto-Owners' Memorandum [95-2] at p. 10.

[24]  See Auto-Owners Memorandum [95-2] at p. 3.

[25]  Grove and R.C. Altman point out to this court that Waverly raised this same argument as grounds for summary judgment in the Georgetown County Court of Common Pleas, and Waverly's motion was denied. See Memorandum by Grove and R.C. Altman [101-1] at p. 4.

Recently, the South Carolina Supreme Court, in Simmons v. Mark Lift Indus., Inc., – S.C. –, 622 S.E.2d 213 (2005) noted that a successor company could be liable for the debts of a predecessor company under certain circumstances. In Simmons, the plaintiff was injured in a work-related accident in 1999 as a result of the collapse of an elevated scissorlift platform on which he was standing.[26] The plaintiff filed a products liability action against the manufacturer of the scissorlift and the company which had purchased the manufacturer's assets at a bankruptcy sale approximately eight (8) years earlier, in 1991. Simmons, 622 S.E. 2d at 214. The purchase agreement, approved by the bankruptcy court, specifically stated that the assets of the manufacturer were transferred to the buyer free and clear of all liabilities, "including, without limitation, any liability for products manufactured or sold by Seller." Simmons, 622 S.E. 2d at 214. Significantly to the South Carolina Supreme Court, the Buyer of the bankrupt corporation's assets "did not have any business relationship with [the Seller] until purchasing its assets in the bankruptcy court auction. **There has never been any commonality of officers, directors, or stockholders between [Seller] and [Buyer].**" Simmons, 622 S.E. 2d at 214 (emphasis in original state court opinion).

The Simmons decision relied on Brown v. American Ry. Express Co., 128 S.C. 428, 123 S.E. 97 (1924), wherein a successor corporation that purchased part of predecessor's assets was held not liable for the lost shipment by the predecessor, where the successor did not assume

---

[26] The Honorable Matthew J. Perry of the United States District Court for the District of South Carolina certified certain questions to the South Carolina Supreme Court. That court issued its opinion on October 24, 2005, and denied the request for rehearing on December 12, 2005.

liability for such debts, and the predecessor remained a live and going concern with substantial assets. The court in Brown stated:

> [I]n the absence of a statute, a successor or purchasing company ordinarily is not liable for the debts of a predecessor or selling company unless (1) there was an agreement to assume such debts, (2) the circumstances surrounding the transaction warrants a finding of a consolidation or merger of the two corporations, (3) the successor company was a mere continuation of the predecessor, or (4) the transaction was entered into fraudulently for the purpose of wrongfully defeating creditors' claims.[27]

Based upon Brown, Justice Waller, writing for a majority of the South Carolina Supreme Court in Simmons, concluded that "a plaintiff may maintain a state law-based product liability claim under a successor liability theory against a successor corporation which purchased the predecessor's assets in a voluntary sale approved by a federal bankruptcy court **provided** one of the one of the exceptions set forth in the Brown opinion applies.[28] Simmons, 622 S.E.2d at 215 (emphasis in original).

Accordingly, Brown stands for the basic proposition that a successor or purchasing company would not be liable for the debts of a predecessor or selling company except under certain circumstances, such as demonstrating that "the successor company was a mere continuation of the predecessor" company. Simmons, 622 S.E.2d at 215 (footnote omitted). The facts of this case easily lead to the inexorable conclusion that the creation and operation of Waverly was designed to continue the business of R.C. Altman after the latter had incurred significant liabilities. For example, R.C. Altman and Waverly had the same corporate officers; Ronald C. Altman was the only person to hold a residential homebuilder license at R.C. Altman,



---

[27] Simmons, 622 S.E.2d at 215 (footnote omitted).

[28] Justice Moore and Acting Justices John W. Kittredge and James R. Berber concurred in Justice Waller's opinion. Justice Burnett wrote a ten (10) page dissent, characterizing the majority's "mechanical application of the factors recited in Brown[.]".

and that license was transferred to Waverly upon its formation; Ronald Altman admitted that Waverly was formed to enable him to obtain credit after Grove brought the underlying state court action; federal tax returns indicate that Waverly was the successor corporation to R.C. Altman; R.C. Altman transferred all of its assets to Waverly, including depreciated equipment; and Waverly assumed the R.C. Altman payroll and employed some of its employees.[29] In short, there is substantial evidence to base a conclusion that Waverly is the successor to R.C. Altman and therefore it is liable for the liabilities of R.C. Altman.

Furthermore, as discussed more fully below, the water damage to the Grove Home occurred over a period of time;[30] and occurred during the time period for which Auto-Owners provided insurance coverage to R.C. Altman, now known as Waverly. As the successor in interest to R.C. Altman's liabilities, Waverly remains responsible for damages that occurred during the policy period. For example, in Auto-Owners Ins. Co. Inc. v. Zurich U.S., 377 F.Supp.2d 496 (D.S.C. 2004), a declaratory judgment action brought to determine liability as between two insurance carriers who issued CGL policies to a home construction company, the Honorable Patrick Michael Duffy held that both insurance companies were responsible for indemnifying the home construction company. In so holding, Judge Duffy relied upon the South Carolina Supreme Court's adoption of the "trigger theory" in Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co., 326 S.C. 231, 486 S.E.2d 89 (1997) where "coverage is triggered whenever the damage can be shown in fact to have first occurred, even if it is before the damage because

---

[29] See Memorandum by Grove and R.C. Altman [101-1] at pp. 4-6 and citations to the record therein.

[30] See (Second Amended Complaint).

apparent, and the policy in effect at the time of the injury-in-fact covers all the ensuing damages." Auto-Owners, 733 F.Supp. 2d at 498, *citing* Joe Harden Builders, Inc., 486 S.E.2d at 91. In other words, coverage under a CGL policy is triggered when the first injury-in-fact occurs, regardless of when the damage becomes manifest. Joe Harden Builders, Inc., 486 S.E.2d at 91. Indeed, under South Carolina law, the trigger liability theory means that "damage [to property] can continue over several policy periods, thus triggering more than one policy[.]" Spartan Petroleum Co. v. Federated Mutual Ins. Co., 162 F.3d 805, 808 (4th Cir. 1998).

In the present case, the Home was completed in August 1997. Auto-Owners concedes that it insured Waverly from November 14, 1998 to July 11, 2000 and again from November 29, 2000 through November 29, 2001. Under the continuous trigger theory adopted by South Carolina, coverage is triggered under every policy thereafter. Therefore, because Auto-Owners is a subsequent insurer, Auto-Owners' policy applies to cover the continuing damage to the Home, and the allegations of the Complaint trigger the duty of defense. Therefore, Auto-Owners' motion for summary judgment should be denied.

### B. The Definition of an "Occurrence"

R.C. Altman and Grove contend that they are entitled to coverage under the CGL policies of insurance issued by Plaintiff and Auto-Owners to R.C. Altman. Having determined that Auto-Owners (and Plaintiff) each has a duty to defend because its policies provide coverage for damages under the trigger theory, the next question before the court is whether defective construction constitutes an "occurrence" under the CGL insurance policies, which state, in identical language:

1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies . . . .
   b. This insurance applies to "bodily injury" and "property damage" only if:
      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
      (2) The "bodily injury" or "property damage" occurs during the policy period.[31]

The policies issued by Plaintiff and Auto-Owners contain the identical definition of "occurrence," which is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[32]

The next question for the court, then, is whether the continuing water intrusion to the Home constitutes an "occurrence" which would make the policies issued by Plaintiff and Auto-Owners applicable.

The South Carolina Supreme Court's recent case of L-J, Inc. v. Bituminous Fire and Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33 (2005) dictates the resolution of the present case. In L-J, Bituminous Fire and Marine Insurance Company ("Bituminous") brought a declaratory judgment action seeking a determination as to whether a CGL policy it had issued to L-J, a contractor, covered damage to a road construction project caused by the faulty workmanship of L-J and its subcontractors. L-J, 366 S.C. at —, 621 S.E.2d at 34. Chief Justice Toal, writing for a unanimous court, held as a matter of first impression that the premature deterioration of the roads as result of the contractor's faulty workmanship did not constitute an "occurrence" within the meaning of the CGL insurance policy issued to L-J. As Chief Justice Toal explained:



---

[31] See Plaintiff's policies CLP 2281435, covering the time period from August 2, 1996 to August 2, 1997 and CLP 3018902, covering the time period from November 10, 1997 to November 10, 1998, attached as Exhibits 7 and 8 to Plaintiff's Memorandum. [100-2]

[32] See policies at Section V, #12.

"[F]aulty workmanship is not something that is typically caused by an accident or by exposure to the same general harmful conditions." L-J, 366 S.C. at —, 621 S.E.2d at 36 (footnote omitted).

The opinion in L-J bears quotation at length by this court:

> We find the analysis used by the New Hampshire Supreme Court [in High Country Assocs. v. New Hampshire Ins. Co., 139 N.H. 39, 648 A.2d 474 (1994)] helpful in distinguishing between a claim for faulty workmanship versus a claim for damage to the work product caused by the negligence of a third party. In High Country Assocs., the court held that a CGL provided coverage for property damage caused by continuous exposure to moisture when the complaint alleged negligent construction that resulted in property damage and not merely negligent construction damaging only the work product itself. Id. at 477. The complaint in High Country Assocs. alleged:
>
>> [a]ctual damage to the buildings caused by exposure to water seeping into the walls that resulted from the negligent construction methods of High Country Associates. The damages claimed are for the water-damaged walls, not the diminution in value or cost of repairing work of inferior quality. Therefore, the property damage described in the amended writ, caused by continuous exposure to moisture through leaky walls, is not simply a claim for the contractor's defective work. Id.

Thus, the New Hampshire Supreme Court held that the alleged negligent construction which led to continuous exposure to moisture and resulted in property damage was an "occurrence". L-J, 366 S.C. at —, 621 S.E.2d at 36, *citing* L-J, 648 A.2d at 478.

In L-J, Chief Justice Toal cited with approval the New Hampshire Supreme Court's reasoning in High Country Assocs.:

> As a result, the court held that the plaintiffs' alleged negligent construction was the result of an occurrence, rather than an allegation of faulty or defective work. Id. at 478. In the present case, the complaint did not allege property damage beyond the improper performance of the task itself. The complaint alleged breach of contract, breach of warranty, and negligence. However, each of the claims repeated verbatim the same allegation--faulty workmanship in completing the project. As a result, the insurance policy will not stand to cover liability for the Contractor's contract liability for a claim that was for money damages to compensate for the defective work.

In the L-J opinion, Chief Justice Toal differentiated between (1) a claim for faulty workmanship and (2) a claim for damage to the work product caused by the negligence of a third party, and held that the facts alleged in L-J constituted a claim for faulty workmanship, and that the damage caused did not constitute an "occurrence" under the terms of the CGL policy issued by Bituminous. Chief Justice Toal concluded by stating:

Page 14 of 18

> Accordingly, we hold that the damage in the present case did not constitute an "occurrence." If we were to hold otherwise, the CGL policy would be more like a performance bond, which guarantees the work, rather than like an insurance policy, which is intended to insure against accidents. (Citing State Farm Fire & Cas. Co. v. Tillerson, 334 Ill.App.3d 404, 268 Ill.Dec. 63, 777 N.E.2d 986, 991 (2002) (holding that if courts were to find that CGL policies covered faulty workmanship, courts would effectively transforming CGL policies into performance bonds)). A performance bond guarantees that the work will be performed according to the specifications of the contract by providing a surety to stand in the place of the contractor should the contractor be unable to perform as required under the contract. Consequently, our holding today ensures that ultimate liability falls to the one who performed the negligent work--the subcontractor--instead of the insurance carrier. It will also encourage contractors to choose their subcontractors more carefully instead of having to seek indemnification from the subcontractors after their work fails to meet the requirements of the contract.

Thus, in High Country Assocs., the New Hampshire Supreme Court held that a "CGL provided coverage for property damage caused by continuous exposure to moisture when the complaint alleged negligent construction that resulted in property damage and not merely negligent construction damaging only the work product itself." L-J, 366 S.C. at —, 621 S.E.2d at 33, citing High Country Assoc., 648 A.2d at 477.

As Plaintiff admits, the CGL policies issued by Plaintiff to R.C. Altman "are identical to those considered by the South Carolina Supreme Court in L-J."[33] Just as in High Country Assocs., the Complaint in the present case alleged that the damages to the Home resulted from water intrusion that occurred over a period of time, and was caused by the negligence of a third party.[34] The Grove Complaint alleged the following salient facts, some of which the undersigned has set out in boldfaced type for emphasis:



> 18. That the work of the Defendants was defective and deficient in the following particulars:
>
> > a. Masonry foundations do not correctly support two brick veneer chimneys nor does the structural wood framing correctly support them. Thus the combined loads of the brick rest directly upon the plywood roof deck, causing deflection in the roof sheathing and the improperly supported wood rafters. **Such deflection has permitted storm water to enter and penetrate deep into the living environment of the home;**

---

[33] See Plaintiff's Memorandum [100-2] at p. 4.

[34] See Second Amended Complaint.

b. The structural wood framing of the lower roofs of the first floor wing additions improperly supports the brick veneer walls on both sides of the house. **This has caused the roof to leak** due to the improper support, improper flashing between the brick veneer and the roof deck, and the failure to install a movement joint between the veneer supported by the wood construction and the veneer supported by the foundation;

c. The brick veneer rolock under each window sill on the exterior of the house slopes inward toward the windows **causing water to accumulate and seep into the interior of the house.** There are no weepholes beneath the rolock sill of each window or above to lintels over each window or door opening in order **to allow for the water seepage to escape;**

d. A concrete masonry unit column that wobbled had been improperly braced;

e. the water access opening in the bedroom wall is not large enough;

f. there are significant amounts of improperly laid brick;

g. mortar is missing in numerous places, **allowing water to enter;**

h. there are numerous cracked bricks **which allow water leakage;**

i. the sidewalls are improperly flashed, necessitating that the sidewalls be demolished,

the flashing corrected, and the walls rebuilt;

j. the rolock is improperly sloped;

k. **no weep holes are present to allow water drainage;**

l. **no slope of the water table exists.**

In addition, Mr. Grove testified during his deposition that water intrusion in the Home caused massive amounts of wood rot, staining, rusting, and other damages which required substantial repair, that water entering the Home caused substantial damages to interior walls, and that water entered the Home in such amounts that it was running down the interior walls.[35]



---

[35] See Deposition of Robert N. Grove taken September 14, 2001 (hereinafter, "Grove Deposition"), pp. 102-108; p. 68; and p. 150-152; attached as Exhibits A, B, and C, respectively, to the Memorandum in Opposition to Plaintiff's motion for summary judgment filed by Grove and R.C. Altman. [105-1]

The statement of repairs to the Home attached as an exhibit to Mr. Grove's deposition state numerous repairs that were required as a result of the water intrusion.[36] For example, some of the repairs include:

> 1 . . . .i  Repair the top sill of the front-side North window of the Living Room. Determine the cause of the water damage and repair as necessary.
>
> > k. . . . -[R]emove and replace water-damaged wood in the vicinity of the exterior door from the Sitting Room
> > -Repair sheet rock tape joint in the Master Bath above the tub that was damaged by water incursion.
>
> 2.      . . . .[O]nce demolition of the south side wall was completed down to the ceiling of the first floor, extensive water damage to the wood of the walls was discovered. . . . Demolition continued to the lower level of the southeast Dining Room wall where the supporting 2x12s were so rotted by water damage they could be torn apart by bare hand. The flooring of the Dining Room adjacent to this wall was also rotten. The wall 2x4 base plates and the studs were also rotten up toward the Dining Room ceiling. The Dining Room Carpet and pad were stained from moisture along this wall.

In contrast to the facts set forth in L-J, the facts of the underlying action make clear that the Grove's claims arose not only as a claim for faulty workmanship, but for defects in residential construction that caused property damage (exposure to moisture). These are the very claims that were found covered by the CGL policy in High Country Assoc., where "the plaintiff in the underlying suit alleged neglect construction that resulted in property damage, rather than merely negligent construction." High Country Assocs., 648 A.2d at 477. The South Carolina Supreme Court has cited that opinion with approval in L-J, making it clear that a CGL policy provides coverage for the damages claimed in the present case. Indeed, Chief Justice Toal cited with approval the New Hampshire court's holding "that a CGL provided coverage for property damage caused by continuous exposure to moisture when the complaint alleged negligent



---

[36]     See Exhibit E to Grove Deposition.

construction that resulted in property damage and not merely negligent construction damaging only the work product itself." See L-J, 366 S.C. at —, 621 S.E.2d at 36, *citing* 648 A.2d at 477.

Thus, Plaintiff's argument that the underlying action only states a claim for faulty workmanship, and thus falls within the exception set out in L-J where faulty workmanship alone constitutes the only damage suffered, is without merit. As the South Carolina Supreme Court, adopting the reasoning of High Country Assocs., observed in L-J, a CGL policy will provide coverage for property damage caused by exposure to moisture which resulted from defective construction because such moisture damage is an "occurrence" under the exact language of the CGL policy at issue in this case. Thus, the moisture damage in the Home is an "occurrence" under the CGL policies issued by the Plaintiff and by Auto-Owners. Accordingly, neither Plaintiff nor Auto-Owners is entitled to summary judgment.

## RECOMMENDATION

For the above-mentioned reasons, this court recommends that a declaratory judgment be entered in favor of Grove and R.C. Altman. It is further recommended that **(1) Auto-Owner's Motion for Summary Judgment [95-1] should be denied; (2) Plaintiff's motion for summary judgment [100-1] should be denied; and (3) the motion for summary judgment filed by Grove and R.C. Altman [109-1] should be granted.**

                                                    */s/ George C. Kosko*
                                                   George C. Kosko
                                                   United States Magistrate Judge

*December 30, 2005*

Charleston, South Carolina