IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Bituminous Casualty Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | C/A No. 2:01-4267-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER and OPINION** |
| R.C. Altman Builders, Inc.; Robert N. Grove; Waverly Building Company, LLC; Auto-Owners Insurance Co.; Carl Nelson d/b/a Nelson Masonry; and Bobby Vincent, d/b/a Vincent's Plumbing, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**Abandon hope, all ye who enter here.**[1]

**I.     BACKGROUND**

Plaintiff Bituminous Casualty Corporation ("Bituminous") seeks a declaratory

---

[1] Dante, The Divine Comedy (Inferno), Canto III.  The welcome sign of the afterlife aptly describes this court's hesitation in construing L-J, Inc. v. Bituminous Fire and Marine Insurance Co., 366 S.C. 117, 621 S.E.2d 33 (2005).  Five months ago, Judge Harwell concluded L-J's ambiguities justified abstention under the district court's limited discretion to abstain from declaratory judgment actions.  See Penn. Nat'l  Mut. Ins. Co. v. Ely Wall & Ceilings, Inc., No. 4:04-1576, 2006 WL 569589 (D.S.C. March 6, 2006).  More recently, Judge Duffy followed the same approach in another construction case turning on L-J's interpretation. Harleysville Mut. Ins. Co. v. Cambridge Bldg. Corp., No. 9:04-23412, 2006 WL 2038302 (D.S.C. July 19, 2006).  Notably, Penn. National and Harleysville involved eleven and thirteen underlying state court complaints, respectively.  The record before Judge Duffy in Harleysville did not include those complaints.  Both courts referenced the numerous underlying complaints as a significant factor in their abstention analysis.  In contrast, the instant case involves one underlying state complaint which is included in the record and discussed by the parties.  Unlike in Penn. National and Harleysville, a motion to dismiss based on abstention grounds is not before this court.  In fact, the parties explicitly request the court not to abstain.  Further, this court benefits from the well-reasoned opinions of Judges Duffy, Wooten, Harwell, and Magistrate Judge Kosko (all of which analyzed L-J), and the thorough briefs of the parties.  Because of the insights garnered by reviewing these opinions, the court declines to abstain, and marches through the gates.

judgment to clarify its obligations under a commercial general liability ("CGL") insurance policy issued to defendant R.C. Altman Builders, Inc. ("Altman"). The action also names Robert Grove ("Grove"), Waverly Building Company LLC ("Waverly"), Auto-Owners Insurance Company ("Auto-Owners"), and others.[2] In an underlying state claim, Robert Grove sued "Robert C. Altman, individually and d/b/a R.C. Altman Builders, now d/b/a Waverly Building Co., LLC," and others[3] for damages arising from construction of the Grove residence on Debordieu Island, South Carolina. A certificate of occupancy was issued August 13, 1997. Grove's complaint alleges Robert Altman controlled Altman.[4] Robert and Faye Altman formed Waverly on March 2, 1998. Bituminous insured Altman during construction of the Grove residence. Auto-Owners insured Waverly.

Grove settled with Altman for a confession of judgment of $300,000.00 and an assignment of Altman's rights under its policy with Bituminous. In February 2003 this court stayed this action pending the resolution of L-J, Inc. v. Bituminous Fire and Marine Insurance Co., 366 S.C. 117, 621 S.E.2d 33 (2005). Subsequently, Bituminous and Auto-

---

[2] Carl Nelson d/b/a Nelson Masonry and Bobby Vincent d/b/a Vincent's Plumbing. Altman has filed counterclaims against Bituminous for insurance bad faith, improper claims practices, and breach of covenant of good faith and fair dealing. (Altman countercl. ¶¶ 25 - 38, doc. 31.) Grove has filed counterclaims against Bituminous for insurance bad faith and improper claims practices. (Grove countercl. ¶¶ 25 - 33, doc. 34.)

[3] Nelson Masonry, Jeff Blackburn, Summers Roofing, Tri County Insulation, and John Summers.

[4] According to paragraph fourteen of the second amended state court complaint, Grove contracted with Altman to construct a residence for Grove for the sum of $359,202.00. Paragraph twenty-one of the second amended complaint alleges that Altman was the general contractor for the construction of the Grove residence and was "ultimately responsible for the construction."

2

Owners each filed motions for summary judgment. On November 30, 2005 this court referred both motions to Magistrate Judge Kosko. One week later, Altman and Grove filed their own motion for summary judgment. The magistrate judge's Report and Recommendation ("Report") addressed all three motions, although this court only referred the insurers' filings.

In the underlying state action, Grove alleges breach of contract, breach of implied warranties, negligence and violations of the unfair trade practices act. Grove contends Altman's work was defective and deficient because improperly laid foundations, masonry and wood framing have permitted water intrusion and other damage.

Bituminous seeks summary judgment on three grounds: (1) there was no occurrence giving rise to coverage; (2) the underlying claim does not constitute property damage, and (3) one or more of the policy's exclusions apply to Grove's claim. Bituminous provided coverage to Altman from August 2, 1996 to August 2, 1997, and from November 10, 1997 to November 10, 1998.

Auto-Owners seeks summary judgment on similar rationales: (1) there is no "successor liability" coverage; (2) there was no occurrence to trigger coverage, and (3) one or more exclusions applied. Waverly's policy with Auto-Owners provided coverage from November 14, 1998 to July 11, 2000, and from November 29, 2000 to November 29, 2001. The magistrate judge concluded that "successor liability" invoked Waverly's policy with Auto-Owners, and that the allegations constituted an "occurrence" giving rise to coverage under both policies. The magistrate judge denied both insurers' motions and granted Grove/Altman's motion for summary judgment.

The insurers object on several grounds. Bituminous contends (1) the Report misapplies L-J in determining whether the claim arises from an "occurrence;" (2) the Report does not address whether the claim meets the policy definition of "property damage," (3) the Report does not address the policy's exclusions, and (4) the Report does not address Bituminous's contention that some damage occurred after the applicable policy period. Auto-Owners objects to the Report's conclusion regarding "successor liability" and contends the magistrate judge erred in construing L-J and in not addressing the policy's exclusions.

## II.     DISCUSSION

### a.     Occurrence

First among the insurers' objections is that the magistrate judge misinterpreted L-J. Few cases have such a complicated history.[5] Needless to say, this latest rendition has occasioned "much throwing about of brains."[6]

L-J considered "whether property damage to the work product alone, caused by faulty workmanship, constitutes an occurrence." L-J, 366 S.C. at 121, 621 S.E.2d at 35. As in L-J, both the Bituminous and Auto-Owners policies apply only if "the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in

---

[5] The South Carolina Court of Appeals issued a decision in 2002. L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 350 S.C. 549, 567 S.E.2d 489 (Ct. App. 2002). The state supreme court reversed in a 2004 opinion. L-J, Inc. v. Bituminous Fire and Marine Ins. Co., No. 28554, 2004 WL 1775571 (S.C. Aug. 9, 2004). The supreme court reheard the case and later withdrew the 2004 decision and issued the present opinion on September 26, 2005. The court denied a rehearing on November 10, 2005.

[6] William Shakespeare, Hamlet, Prince of Denmark, act II, sc. II.

4

the 'coverage territory.'" Bituminous Policy §1.b.1; Auto-Owners Policy §1.b.1. Also as in L-J, both policies define occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In L-J, the insured general contractor was responsible for constructing a road which later deteriorated. After settling various negligence and warranty claims, the general contractor sought indemnification from its insurers. One insurer refused to contribute, and a declaratory judgment action ensued. The state supreme court's latest opinion noted

> [T]hese negligent acts [of the contractor and subcontractors during road design, preparation, and construction] constitute faulty workmanship, which damaged the roadway system only. And because faulty workmanship is not something that is typically caused by an accident or by exposure to the same general harmful conditions, we hold that the damage in this case did not constitute an occurrence.[4]
>
> > [4] The CGL policy may, however, provide coverage in cases where faulty workmanship causes a third party bodily injury or damage to other property, *not in cases where faulty workmanship damages the work product alone*.
>
> We find the analysis used by the New Hampshire Supreme Court helpful in distinguishing between a claim for faulty workmanship versus a claim for damage to the work product caused by the negligence of a third party. High Country Assocs. v. New Hampshire Ins. Co., 139 N.H. 39, 648 A.2d 474 (1994). In High Country Assocs., the court held that a CGL [policy] provided coverage for property damage caused by continuous exposure to moisture when the complaint alleged negligent construction that resulted in property damage and not merely negligent construction damaging only the work product itself. Id. at 477. The complaint in High Country Assocs. alleged:
>
> > [a]ctual damage to the buildings caused by exposure to water seeping into the walls that resulted from the negligent construction methods of High Country Associates. The damages claimed are for the water-damaged walls, not the diminution in value or cost of repairing work of inferior

5

> quality. Therefore, the property damage described in the
> amended writ, caused by continuous exposure to moisture
> through leaky walls, is not simply a claim for the contractor's
> defective work.
>
> Id. As a result, the court held that the plaintiffs' alleged negligent
> construction was the result of an occurrence, rather than an allegation of
> faulty or defective work. Id. at 478.
>          In the present case, the complaint did not allege property damage
> beyond the improper performance of the task itself. The complaint alleged
> breach of contract, breach of warranty, and negligence. However, each of
> the claims repeated verbatim the same allegation--faulty workmanship in
> completing the project. As a result, the insurance policy will not stand to
> cover liability for the Contractor's contract liability for a claim that was for
> money damages to compensate for the defective work.

L-J, 366 S.C. at 123-24, 621 S.E.2d at 36.  Bituminous and Auto-Owners emphasize two sentences: the court's distinction between claims for faulty workmanship and "for damage to the work product caused by the negligence of a third party," and footnote four. The insurers urge the court to read the "third party" phrase as permitting coverage only where "the insured's relationship to the damaged property is . . . the relationship of a third party."  (Bituminous obj., doc. 115, at 3.)  Under this reading, an insured subcontractor whose faulty workmanship permits water intrusion that damages the work product of another subcontractor could get coverage for the damage to the other's work product.  The insurers argue that since Altman is the general contractor it is responsible for the entire project and the acts of its subcontractors, and therefore the negligence at issue is not that of a "third party."  Similarly, they argue that footnote four excludes coverage where the faulty workmanship damages the work product alone.  In sum, the insurers assert that since Altman was the general contractor responsible for the entire project, the damage is neither caused by a third party nor beyond the work product alone.

6

As such, Bituminous and Auto-Owners contend L-J prohibits coverage.

In contrast, Altman implicitly suggests the "work product" is not the entire general contractor's project, but each specific subcontractor's task. This reasoning is the only way to square Altman's conclusion with the two qualifications discussed above. Altman does not specifically address the third party language of L-J.

Several factors point towards the insurers' interpretation. First, it is a stretch to claim the "work product" of a general contractor is anything other than the entire project. Here, Altman contracted to build a residence for Grove; therefore, Altman's "work product" is Grove's house. As noted below, a contrary reading is inconsistent with L-J's policy discussion.

Altman's reliance on the outcome in High Country Associates v. New Hampshire Ins. Co., 648 A.2d 474 (1994) is misplaced.[7] L-J cites High Country to distinguish between faulty workmanship claims and claims for damage to work product caused by third parties. The South Carolina Supreme Court's discussion of High Country demonstrates the difference between claims for defective work and claims for damage stemming from that defective work. The limited excerpts and discussion of High Country do not reveal that the insured in that case was the general contractor.[8] The South

---

[7] Altman's briefs are replete with comparisons to the specific facts in, and conclusion of, High Country. As discussed above, the South Carolina Supreme Court apparently cites that opinion for limited purposes.

[8] A review of the entire High Country opinion demonstrates that the insured in that case constructed the condominium units. High Country, 648 A.2d at 40 - 42. The absence of that factor in L-J's review of High Country contrasts sharply with Altman's reliance on it, and suggests the South Carolina Supreme Court used High Country not for its outcome, but merely to distinguish between damage to defective work and damage

Carolina Supreme Court cited <u>High Country</u> for its analysis, not its conclusion.[9]

However, Altman relies on factual similarities with the substance of <u>High Country</u> and its favorable outcome. This court does not believe the <u>High Country</u> outcome is controlling.

The policy considerations discussed in <u>L-J</u> also support the insurers' interpretation. The supreme court noted its

> holding . . . ensures that ultimate liability falls to the one who performed the negligent work - the subcontractor - instead of the insurance carrier. It will also encourage contractors to choose their subcontractors more carefully instead of having to seek indemnification from the subcontractors after their work fails to meet the requirements of the contract.

<u>L-J</u>, 366 S.C. at 124, 621 S.E.2d at 37. Permitting Altman to recover in this context runs counter to these considerations. Finding coverage would penalize the general contractor's carrier rather than the negligent party, the subcontractor. Further, affording coverage to a general contractor for damage to a residence stemming from its subcontractor's defective work would not encourage general contractors to more

---

stemming from defective work.

[9] <u>High Country</u> is included in <u>L-J</u> because the quoted paragraph distinguishes between damage to the work product itself and damage to other property. Judge Duffy's order in <u>Okatie Hotel Group, LLC v. Amerisure Ins</u>., No. 2:04-2212, 2006 WL 91577 (D.S.C. Jan. 13, 2006) recognizes the distinction between improper performance of the task itself (not covered) and "alleged property damage beyond damage to the work product" (possibly covered). However, this court would not reach the same conclusion in <u>Okatie</u>. This court would hold the damage was limited to insured's work product, i.e., the entire house. The parties in <u>Okatie</u> subsequently settled before the court could rule on a motion for reconsideration. On similar facts, Judge Wooten arrived at the same conclusion in <u>Pennsylvania Manufacturers' Ass'n Ins. Co. v. Dargan Construction Co</u>., No. 4:05-113, 2006 WL 2038270 (D.S.C. July 13, 2006). Judge Wooten relied heavily on <u>Okatie</u>, Magistrate Judge Kosko's Report in this case, and <u>High Country</u>.

carefully select their subcontractors.[10]

Bituminous and Auto-Owner's argument that the entire house is the general contractor's "work product" is analogous to interpretations of the "faulty workmanship provision." That provision excludes from coverage "'property damage' to . . . . [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." See Bituminous Policy § I.2.j.6. "Your work" includes "work or operations . . . performed . . . on your behalf." Id. § V.19.a.

In Century Indemnity Co. v. Golden Hills Builders, Inc., 348 S.C. 559, 561 S.E.2d 355 (2002), the insured was the general contractor responsible for the entire home. A subcontractor's negligent work in applying the stucco allowed water to enter the interior, which damaged the properly constructed framing and substrate. Upon certification by the Fourth Circuit, the supreme court considered whether the faulty workmanship provision precluded the insured general contractor's claim for damage stemming from a subcontractor's improper work. The supreme court apparently interpreted "it" in the faulty workmanship provision to refer to the entire property upon which the insured performed work; in other words, the entire house. "It" was seen to encompass all parts of the general contractor's project, as opposed to only the work of the subcontractor. This interpretation reflects the fact that the insured general contractor was

---

[10] This court's opinion would encourage general contractors to hire subcontractors with the financial wherewithal to stand behind their own work or to make sure the subcontractors have insurance to cover the results of their defective work. Damages to the subcontractor's own work product resulting from its own defective work would not be covered; however, the insurance would cover damage to the work product of other subcontractors.

responsible for the entire structure.

While the supreme court did not discuss the "it" interpretation issue, the Fourth Circuit noted the different interpretations in its certification order.  See Century Indemnity Co. v. Stoltz, 248 F.3d 253, 258 (4th Cir. 2001) ("Century urges us to read the pronoun 'it' and its antecedent ('[t]hat particular part of any property that must be restored, repaired or replaced') as referring to the entirety of the Stoltzes' home, inasmuch as Golden Hills Builders was the general contractor engaged to construct the entirety of the Stoltzes' home.").

This court recognizes that analysis of the "faulty workmanship provision" is distinct from L-J's "occurrence" discussion.[11]  Nonetheless, similar principles apply.  In support of its conclusion, Century Indemnity invoked the "purpose of CGL policies" and noted CGL insurers are "not obligated to defend insured where action against insured did not involve accidental injury to *property other than that on which insured was performing its work.*" Century Indem., 348 S.C. at 567, 561 S.E.2d at 360 (citing C.D. Walters Constr. Co. v. Fireman's Ins. Co., 281 S.C. 593, 316 S.E.2d 709 (Ct. App. 1984) (emphasis in original)); see also Carolina Prod. Maint., Inc. v. U.S. Fidelity and Guar. Co., 310 S.C. 32, 37, 425 S.E.2d 39, 42 (Ct. App. 1992) (reversing summary judgment in insurer's favor because evidence suggested insured "was responsible for only certain parts of the [work product], and not for the entire thing."). L-J's footnote four reflects

---

[11] Coverage excluded by the faulty workmanship provision can be restored by the "products-completed operations hazard."  The latter is an exception to the general exclusion.  For purposes of the "work product" question discussed above, the "faulty workmanship" analogy is useful because it demonstrates that a subcontractor's faulty work can be imputed to the insured general contractor, as in Century Indemnity.

this concern.

These considerations support Bituminous's summary of L-J's "third party" language:

> The words "of a third party" show that the [s]upreme [c]ourt meant to highlight that coverage under the policy would only be afforded to that part of the total project which is other than the work product of the insured contractor. Only where the damaged work was performed by some other contractor would the contractor whose policy is under review be a "third party" and entitled to coverage for this negligence in damaging that property.

(Bituminous mem. in opp'n, doc. 112, at 2.) As L-J states, CGL policies do not cover faulty workmanship. Therefore, a general contractor's CGL policy does not provide coverage to repair or replace its subcontractor's defective work. Further, L-J apparently demonstrates that damage stemming from defective work that is limited to the general contractor's work product is not an occurrence.

### c.     Application of L-J

"In an action for declaratory judgment, the obligation of a liability insurance company to defend and indemnify is determined by the allegations in the complaint." Mfr. & Merch. Mut. Ins. Co. v. Harvey, 330 S.C. 152, 162, 498 S.E.2d 222, 228 (Ct. App. 1998). The majority of Grove's complaint alleges pure faulty workmanship; i.e., defective and deficient work. These allegations are clearly not covered. However, "Exhibit A," incorporated into paragraph seventeen, alleges poor workmanship on various aspects of the house allowed water intrusion that damaged the interior of the structure. These allegations would be covered if they involve items other than Altman's "work product;" i.e, the Grove's residence. Therefore, coverage exists for damage to

items which were not the work product of the general contractor or its subcontractors. There is no coverage for damage to aspects of the residence for which Altman or its subcontractors were responsible, as those aspects constitute Altman's "work product." Exhibit A does not specify what parts of the interior were damaged by the water intrusion.

### d.     Exclusions

Given the above findings, the court need not address the exclusions.

### III.     CONCLUSION

For the reasons stated above, the court finds that the claims against Altman or Waverly for defective work do not constitute an occurrence, and therefore are not covered under either insurers' policy. The damage resulting from defective workmanship is covered by Altman's policy to the extent that this damage is to property not the work product of Altman or its subcontractors.

There remains the possibility that claims against Waverly could be covered if the damage was to property which was not Altman/Waverly's "work product." As noted, Grove/Altman seeks to invoke Waverly's policy with Auto-Owners via "successor liability." The court reserves judgment on whether successor liability can invoke a putative successor's CGL policy. This difficult question might be rendered moot upon the parties' review of this order. Specifically, this order requires Grove to clarify what damage, if any, occurred to property not within Altman/Waverly's "work product." If there is no covered damage, then Waverly's policy with Auto-Owners is not invoked. To allow the parties to review this order, the court will schedule a status conference to

discuss these issues on August 9, 2006 at 10:00am.

It is therefore **ORDERED** that defendant Auto-Owner's motion for summary judgment is **GRANTED** in part and **DENIED** in part**.**  It is further **ORDERED** that plaintiff Bituminous's motion for summary judgment as to coverage is **GRANTED** in part and **DENIED** in part.  In the interim, the court will take under advisement Bituminous's motion for summary judgment as to Grove and Altman's counterclaims.

Consistent with this ruling, it is further **ORDERED** that Grove and Altman's motion for summary judgment is **DENIED** in part and **GRANTED** in part.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 28, 2006**
**Charleston, South Carolina**